**UNITED STATES of America,**
**Plaintiff,**

v.

**Lal P. ROHIRA, Defendant.**

**No. 1:02CR22.**

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 4, 2005.

See also, 2005 WL 323679.

Albert A. Giuliani, Anthony A. Gedos, Geoffrey S. Mearns, Cleveland, OH, for Lal P. Rohira, Defendant.

## MEMORANDUM OPINION AND ORDER

ANN ALDRICH, District Judge.

A jury convicted Dr. Rohira on five charges related to an alleged health care billing fraud conspiracy. Rohira moved for a new trial or for a judgment of acquittal. Rohira advances three grounds for a new trial. First, Rohira contends that improper prosecutorial remarks deprived him of a fair trial. Second, Rohira contends that the prosecution violated *Brady* by failing to provide a letter wherein it assured government witnesses that they would not be investigated or charged, and expressed the expectation that they would testify at trial. Third, Rohira contends that his trial counsel provided constitutionally ineffective assistance. Lastly, Rohira moves for acquittal on the ground that the evidence was insufficient to support verdicts of guilt beyond a reasonable doubt.

For the reasons that follow, Rohira is entitled to a new trial pursuant to the Supreme Court's decisions in *United States v. Booker* (2005) and *Blakely v. Washington* (2004). Alternatively, Rohira might be entitled to a new trial due to a *Brady v. Maryland* violation. This disposition obviates the need to consider Rohira's other asserted grounds for a new trial or his motion for acquittal.

## I. BACKGROUND

Dr. Lalsingh P. Rohira, M.D., is a licensed psychotherapist who operated his own practice with offices in Lorain, Vermillion, and Sandusky, Ohio. The government issued a five count indictment charging Rohira with violating four provisions of Title 18: section 2 (aiding and abetting), section 371 (conspiracy), section 1343, and section 1347. The indictment alleged that Rohira conspired with, and aided, codefendants Martin Williams and Sharonne Szy-

rej in defrauding medical insurers by knowingly and willfully submitting false bills. Szyrej was a therapist and Williams was Rohira's clinical manager or his office/business manager. *See* July 21 Tr. at 24.

Specifically, the government alleged that Rohira and his coconspirators "upcoded" short "medcheck" visits to bill them as more remunerative psychotherapy sessions; billed therapy sessions performed by Szyrej, an individual whom they knew to be unlicensed, as if they were performed by a licensed psychotherapist; and billed missed or cancelled appointments as if they had occurred.

Rohira and Williams were tried separately. At Rohira's trial, the government called fourteen witnesses, including billing clerks Telly Peters, Diane (Amato) Zemanek, and Deborah (Alford) Thayer; unlicensed therapist Szyrej; representatives of health plans and medical insurers to whom Rohira's practice submitted claims; and FBI Special Agent Paul Graupmann.

Agent Graupman, who conducted the investigation, provided what he charitably called a "rough estimate" of the loss caused by the alleged fraudulent billing: over $1 million. Graupmann testified that he arrived at the estimate by multiplying the difference between the bill for a "med check" and a bill for a therapy session ($30) by the number of patients in a week (he guessed sixty) and then by forty-eight weeks per year for ten years. Graupmann did not testify as to which ten years were covered by the estimate, and he admitted that he had not reviewed any records for 1991 through 1993. *See* Rohira's JNOV Mot. at 9–10 (citing July 18 Tr. at 79, 85–99).

Rohira's defense was that he was guilty only of operating a disorganized practice and negligently managing his offices' billing. Rohira maintains that he merely continued the former practitioners' billing practices and "delegated a great deal of responsibility to untrustworthy people...." In other words, the evidence shows imprudence but not an intent to defraud. *See* Rohira JNOV Mot. at 1–4 (citing, *inter alia,* July 15 Tr. at 7, 8, 33–34 (Peters) and *id.* at 90–92 (Thayer). Rohira emphasizes that he had no day-to-day involvement with billing and tasked Williams with overseeing billing and rectifying any discrepancies. *See* Rohira's JNOV Mot. at 6 and 13–14 (citing Zemanek, July 16 Tr. at 89, and Rohira, July 22 Tr. at 49, 53 and 63–64)).

## II. *BOOKER* and *BLAKELY*

### A. *Booker's* Precursors

The court recounts *Booker's* precursors: *Jones v. US,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), *Apprendi v. NJ,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Blakely v. WA,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

In *Jones* the Supreme Court considered the federal carjacking statute, which provides different maximum terms of imprisonment based on the extent of harm to the victim: fifteen years if there was no serious bodily injury, twenty five years if there was, and life if the victim died. At first blush these seemed to be only sentencing provisions. On further analysis, however, the Court concluded that harm to the victim should be treated as an element of the offense and proved to the jury beyond a reasonable doubt. Foreshadowing the rule in *Booker,* the Court noted that its holding was consistent with a "rule requiring jury determination of facts that raise a sentencing ceiling" in a state or federal sentencing guidelines system. *See Jones,* 526 U.S. at 251 n. 1, 119 S.Ct. 1215.

In *Apprendi* the defendant burned a black family's home and pled guilty to, *inter alia,* possession of a firearm for an unlawful purpose, punishable by five to ten

years in prison. After Apprendi's plea, the prosecution moved to enhance the sentence based on the state's hate crime statute. That statute authorized the court to increase the maximum sentence to between ten and twenty years if it found, by a preponderance of the evidence, that he acted with the purpose of intimidating a person because of the person's race or other specified characteristics. The district judge found that Apprendi had acted with the requisite purpose, and enhanced his sentence accordingly, and the Third Circuit affirmed. *See Apprendi,* 530 U.S. at 469–73, 120 S.Ct. 2348. The Supreme Court reversed, holding that the Sixth Amendment does not permit the defendant to be "expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone. * * * Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 483, 490, 120 S.Ct. 2348.

Two years later, the Supreme Court elaborated in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). A jury acquitted Ring of premeditated murder but found him guilty of felony murder. Under state law, the court could not sentence him to death unless it found at least one aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency. The court found two aggravating factors (the offense was especially cruel, and it was committed for pecuniary gain) and one mitigating factor (Ring's minimal criminal record). Finding that the mitigating factor did not merit leniency, the court sentenced Ring to death. *See Ring,* 536 U.S. at 589–95, 122 S.Ct. 2428.

The Supreme Court reversed and remanded for resentencing. The Court held

that as interpreted by *Apprendi,* the Sixth Amendment did not allow "a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348, . . . the Sixth Amendment requires that they be found by a jury." *Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (overruling *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)).

Then, last year, the Supreme Court issued *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Blakely pled guilty to kidnaping, punishable by up to ten years in prison under state law. Other provisions of state law mandated a "standard" sentence of 49 to 53 months unless the judge found aggravating facts justifying an exceptional sentence. Although the prosecutor recommended a sentence in the standard range, the judge found that Blakely had acted with deliberate cruelty and sentenced him to ninety months. The Supreme Court held, in pertinent part,

> [T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. * * * In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority.

*Blakely,* —— U.S. at ——, 124 S.Ct. at 2536 (internal citations omitted). The

Court held that the state system, which determined sentences from a grid based on facts found by the judge, encroached on the jury's Sixth Amendment factfinding authority.

## B. *Booker* (U.S.2005)

Last month the Supreme Court decided *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The government charged Booker with possession with intent to distribute at least fifty grams of cocaine base. Having heard evidence that Booker had 92.5 grams of crack in his duffel bag, the jury found him guilty. The statute prescribed a minimum of ten years in prison and a maximum of life. Based on Booker's criminal history and the quantity of drugs necessarily found by the jury, the Guidelines required 210 and 262 months imprisonment.

The judge, however, held a post-trial sentencing hearing and found by a preponderance of the evidence that Booker had possessed an additional 566 grams of crack and that he was guilty of obstructing justice. Given those findings, the Guidelines required 360 months to life in prison, and the judge chose the low end. Thus, instead of the 21–plus years Booker could have received based on the facts proved to the jury, Booker received thirty years.

*See Booker*, 125 S.Ct. at ——, 2005 WL 50108 at *——.

The Supreme Court held that the judge violated Booker's Sixth Amendment right to trial by jury by increasing his sentence based on a fact found by the judge by a preponderance (rather · than by the jury Beyond a reasonable doubt). The Court first held that *Blakely* applies to the federal Guidelines:

> [T]here is no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue in that case. * * * This conclusion rests on the premise, common to both systems, that the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges.

*Booker*, 125 S.Ct. at 749–50. The Court concluded that two Guidelines provisions are unconstitutional under *Blakely*: the provision making the Guidelines mandatory,[1] and the appellate review provision that required district judges to impose sentence within the Guideline range or justify their departure. The Court found these provisions severable from the remainder of the Guidelines, so there was no need to invalidate the Guidelines in their entirety. Instead, the court invalidated only the two provisions,[2] rendering the Guidelines merely advisory. The Court wrote:

---

1. Title 18 U.S.C. § 3553(b)(1) required "a sentence of the kind, and within the range" prescribed by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the Commission that should result in a different sentence.

2. Title 18 U.S.C. § 3742(e)(1, 2) required circuit courts to determine whether a sentence had been imposed in violation of law or "as a result of an incorrect application of the sentencing guidelines."
   Subsection (3) required the circuit to vacate a sentence outside the applicable range if the district court failed to provide a written state-

ment of reasons, or if it departed based on a factor that did not advance the objectives set forth in section 3553(a)(2), was not authorized under section 3553(b), or was not justified by the facts of the case.
Subsection (3) also required the circuit to vacate any sentence that departed "to an unreasonable degree" from the range, "having regard for the factors to be considered in imposing a sentence, as set forth in § 3553(a) ... and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of § 3553©."
Lastly, subsection (3) required the circuit to vacate a sentence if it was imposed for an offense for which there was no applicable guideline and was plainly unreasonable.

If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. * * * Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the SRA [Sentencing Reform Act of 1984, which created the Guidelines] the provisions that make the Guidelines binding on district judges.... For when a trial judge exercises his discretion to select a specified sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

The Guidelines as written, however, are not advisory; they are mandatory and binding on all judges. While subsection (a) of § 3553 of the sentencing statute lists the Sentencing Guidelines as one factor to be considered in imposing a sentence, subsection (b) directs that the courts "*shall* impose a sentence of the kind, and within the range" established by the Guidelines, subject to departures in specific, limited cases.

\*　\*　\*　\*　\*　\*

The availability of a departure in specific circumstances does not avoid the constitutional issue, just as it did not in *Blakely* itself. * * * Importantly, ... depar-

tures are not available in every case, and in fact are unavailable in most. * * *

\*　\*　\*　\*　\*　\*

Booker's case illustrates the [constitutional infirmity of] the mandatory nature of the Guidelines. The jury convicted him of possessing at least 50 grams of crack.... Under these facts, the Guidelines ... authorized a sentence of 210–to–262 months. * * *

Booker's actual sentence, however, was 360 months, almost 10 years longer than the Guidelines range supported by the jury verdict alone. To reach this sentence, the judge found facts beyond those found by the jury: namely, that Booker possessed 566 grams of crack in addition to the 92.5 grams in his duffel bag. The jury never heard any evidence of the additional drug quantity, and the judge found it true by a preponderance of the evidence. Thus, just as in *Blakely,* the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.

*Booker,* 125 S.Ct. at 750–51. (internal citations, quotation marks and footnotes omitted, emphasis in original).[3, 4]

The Court noted that Congress has increasingly passed legislation authorizing or mandating increased punishment based on facts found by the judges by a preponderance. *Booker,* 125 S.Ct. at 750 (citations omitted). The Court lamented the weakening of the right to a jury trial:

The effect of the increasing emphasis on facts that enhanced sentencing ranges, however, was to increase the judge's

---

**3.** The Supreme Court has not yet mentioned *Booker,* except for one Justice's dissent with regard to the avoidance of constitutional questions. *See Clark v. Suarez Martinez,* —— U.S. ——, 125 S.Ct. 716, 733, 160 L.Ed.2d 734 (2005) (Thomas, J., dissenting).

**4.** Our Circuit has not yet had occasion to clarify how *Booker* affects trials or sentencings. Thus far, only one unpublished opinion mentions *Booker,* and it does not provide guidance for the instant situation. *See U.S. v. Davis,* 397 F.3d 340, 2005 WL 130154, at \*4 (6th Cir.2005) (citation omitted).

power and diminish that of the jury. It became the judge, not the jury, that determined the upper limits of sentencing, and the facts determined were not required to be raised before trial or proved by more than a preponderance. As the enhancements became greater, the jury's finding of the underlying crime became less significant. And the enhancements became very serious indeed. * * *

As it thus became clear that sentencing was no longer taking place in the tradition [of jury primacy]..., the Court was faced with the issue of preserving an ancient guarantee under a new set of circumstances. ·The new sentencing practice [of enhancements based on judge-found facts] forced the Court to address the question how the right of jury trial could be preserved, in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government under the new sentencing regime

*Booker*, 125 S.Ct. at 750–51.

### C. *Booker* Applies to Rohira's Case

■■■ When a decision "results in a 'new rule,' that rule applies to all criminal cases still pending on direct review," *Schriro v. Summerlin*, —— U.S. ——, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004) (citation omitted) i.e. motions asking the trial court to vacate a conviction or sentence, and appeals from the denial of such motions. A case announces a new rule "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Blakely*, —— U.S. at ——, 124 S.Ct. at 2549 (citation omitted). The rule announced in *Booker* was not dictated by prior precedent, so *Booker* announced a new rule.

■■■ Rohira's convictions were still on direct review when the Court issued *Booker*, so *Booker's* rule applies both to his convictions and any sentence that may be imposed. *See Booker*, 125 S.Ct. at 769; *US v. Hughes*, 396 F.3d 374 (4th Cir.2005). Rohira's motions did not raise *Blakely* as a ground for a new trial, but he could not have, because it was not until last month that the Supreme Court clarified that *Blakely* applies to federal criminal defendants and the U.S. Sentencing Guidelines. *See* Fed.R.Crim.P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the Court's attention.").

### D. Discussion: Rohira is Entitled to a New Trial under *Booker* and *Blakely*

1. *Jury Was Never Expressly Charged with Finding the Amount of Loss beyond a reasonable doubt.and Special Agent's Unreliable Estimate May Have Tainted their Deliberation*

The prosecution called FBI Special Agent Graupmann to testify about the amount of financial loss caused by the defendant's alleged billing fraud; through a dubious method discussed below, he estimated the loss at over $1 million.[5] Under *Booker* and *Blakely*, that is a fact that must be admitted by the defendant or expressly found by the jury beyond a reasonable doubt before it may be used to help convict him or to increase his sentence.

■■■ In this connection, it bears noting that jurors may have been inclined to give the Special Agent's testimony particular weight because of the respect and credibility customarily accorded law enforcement officers. *Cf. Briscoe v. LaHue*, 460 U.S.

---

5. The prosecution's use of this deeply flawed estimate of a central fact may constitute grounds for a new trial independent of *Booker* and *Blakely*.

325, 342, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (Court opined that party's contention that "the policeman in uniform carries special credibility with jurors" had "some force"); *US v. Alston*, 375 F.3d 408, 412 (6th Cir.2004) (treating as legitimate the concern that jurors might accord greater weight to law enforcement officers' testimony because of their status, but holding that under the circumstances the concern was adequately addressed by the jury instructions).

Jurors may have been inclined to attach further weight to the Special Agent's testimony because he conducted the FBI investigation in Rohira's offices. From that direct experience, jurors could infer that Graupmann was especially familiar with Rohira's billing records and the extent of their inaccuracy, and they might also treat him as an expert on healthcare billing and fraud more broadly. *See generally U.S. v. Persinger*, 83 Fed.Appx. 55, 60, 2003 WL 22905307 at *5 (6th Cir.2003) (court and prosecution must ensure that jury is aware of law enforcement officer's dual role as fact witness and expert witness, but any failure to do so did not warrant reversal, because *inter alia* the officer's testimony did not involve any disputed factual questions).

The heavy weight which the jury likely attached to the Special Agent's loss estimate is particularly troubling given that the estimate was so poorly supported. In addition to the fact that the jury was never expressly charged with finding the amount of loss, their consideration of that crucial factual issue may have been tainted by an unreliable but seemingly credible estimate.*

2. *Unreliable Loss Estimate Likely Influenced Jurors' Decision on Guilt or Innocence*

Just as troubling, the stock that jurors placed on Special Agent's flawed estimate of loss may have influenced their impression on the ultimate issue: guilt or innocence. The sheer number and regularity of false claims underlying such a large estimate could dispel any notion that the incorrect bills were merely mistakes—or, if the misbilling was deliberate, that it was infrequent enough for Rohira or Williams not to know about them. Dispelling such an inference was critical to the prosecution, given that Rohira and Williams were charged with offenses requiring proof of knowledge and willfulness rather than mere negligence.

In addition to supporting the inference that Rohira and Williams must have known about the incorrect claims being submitted by Rohira's staff, Graupmann's shocking loss estimate could have a powerful *emotional* impact on the jury. Rohira and Williams are charged with bilking medical insurers, and it is realistic to expect some jurors to realize that such fraud contributes to rising premiums for healthcare insurance, including their own. Similarly, to the extent the jurors found that Rohira's practice submitted false claims paid by government programs, they could realize that such fraud diverts public funds from legitimate health care needs and causes higher taxes—their taxes.

3. *Jury's Consideration of Amount of Loss at Trial Is Inextricably Linked to Its Consideration of that Same Issue at Sentencing*

Moreover, the constitutional infirmity lies not merely in the fact that the estimate may have helped secure the defendants' convictions. The jury will have to decide that same factual issue at sentencing, and much or all of the evidence on the amount of loss will be the same as that presented at trial. For this reason, the jury's consideration of loss when weighing guilt or innocence cannot be neatly sepa-

rated from its revisiting the issue for purposes of sentencing. Their factual findings at the two stages of these proceedings are inextricably intertwined.

At *all* phases of the prosecution, such potentially determinative factual issues should be expressly submitted to the jury. The submission should be accompanied by an instruction that the jury must find beyond a reasonable doubt all facts that are elements of the offenses charged or necessarily influence their determination of an element. *United States v. Dottery*, 353 F.Supp.2d 894, 897, 2005 WL 174634, at *3 (E.D.Mich.2005) and decisions cited therein help to make this latter point. There, a district court considered Dottery's pretrial motion contending that the government entrapped him into committing offenses charged in the indictment involving cocaine base ("crack"). Dottery planned to contend at trial that he was a low-level powder cocaine dealer who was not predisposed to deal in other drugs such as crack. The district court noted,

> Although the Sixth Circuit has at times expressed confusion over whether the quantities and types of drugs constitute "elements" of a crime under 21 U.S.C. § 841, ... *there can be no doubt that where the kind and quantity of drug increases the statutory maximum penalty ... the amount and type of drugs are elements of the offense that must be charged in the indictment and proved beyond a reasonable doubt.* [other citations omitted] *Booker*, 125 S.Ct. at 755–56 (reiterating that any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt)
> ....

*Id.* at 353 F.Supp.2d at ——, 2005 WL 174634, *3 (emphasis added). *Dottery* also

cites *United States v. Cotton*, 535 U.S. 625, 632, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), where the Supreme Court noted the government's concession that "the indictment's failure to allege a fact, drug quantity, that increased the statutory maximum sentence, rendered respondents' enhanced sentences erroneous under the reasoning of *Apprendi* and *Jones* ".

## III. ROHIRA'S OTHER ARGUMENTS

Having concluded that Rohira is entitled to a new trial on other grounds, the court need not consider Rohira's contention that he is entitled to a new trial due to ineffective assistance of counsel or improper prosecutorial remarks. Likewise, the court does not consider Rohira's contention that the evidence adduced at trial was insufficient to find him guilty beyond a reasonable doubt.

## IV. CONCLUSION

Rohira's convictions are vacated pursuant to *Booker* and *Blakely,* and he is entitled to a new trial. Rohira's motion for a new trial on other grounds [doc. no. 106] and his motion for judgment of acquittal due to insufficient evidence [doc. no. 107] are denied without prejudice.

Unless the court orders otherwise, Rohira will be tried jointly with Martin Williams. *See U.S. v. Beverly*, 369 F.3d 516, 534 (6th Cir.2004) (strong presumption in favor of joint trials when charges will be proved by same evidence and result from the same acts).

The court sets a final pretrial for Tuesday, April 12, 2005 at 2:00 p.m. The trial shall commence on Monday, May 2, 2005 at 9:00 a.m. Proposed jury instructions and voir dire are due one week prior to trial. Any questions should be directed to Court-

room Deputy Clerk, Victoria Kirkpatrick at 216–357–7202.

IT IS SO ORDERED.