**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0475n.06

**No. 18-3499**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 11, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| ANGELA BOWSER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:     BOGGS, BATCHELDER, and STRANCH, Circuit Judges.

**BOGGS, Circuit Judge.** Angela Bowser was a social worker and a program manager for a company called BRIDGES. BRIDGES had a series of contracts to give job training to welfare recipients. The company's general manager, Daniel Morris, overbilled for its services, thereby defrauding the federal government of more than $3.5 million. He used some of the proceeds to help Bowser buy a house and a car, and he also wrote her numerous non-payroll checks from a company account. A jury convicted Bowser of conspiracy, federal-program fraud, and money laundering. She now challenges the sufficiency of the evidence and the district court's Sentencing Guidelines calculation. We are unpersuaded by these arguments, and we affirm her conviction and sentence.

I. Background

BRIDGES opened for business in Toledo, Ohio in 2001. Daniel Morris was the company's general manager, and his job "was to run everything." Bowser worked at the company from September 2008 to November 2014, first as a social worker and later as a program manager.

From 2004 to 2015, BRIDGES had 17 contracts with the Lucas County, Ohio Department of Job and Family Services, worth more than $15.7 million. These contracts related to Temporary Assistance to Needy Families, a cash assistance program for certain low-income households. The federal Department of Health and Human Services funds TANF by giving block grants to the states. In Ohio, the state passes the money to county agencies, which administer the program. Lucas County hired BRIDGES to help TANF recipients train for and find jobs. To this end, BRIDGES and the county entered into a series of "cost reimbursement contracts." BRIDGES provided its services, incurred the resulting costs, and periodically requested reimbursement from the county.

This is where the fraud happened. BRIDGES did the work. But Morris inflated his reimbursement requests and falsified supporting documents. He invented "ghost employees," overstating the company's payroll expenses. He also exaggerated his real employees' transportation expenses. To survive annual audits by the county, he had his accountant keep "a separate set of books." Morris and the accountant also forged bank records, audit reports, board-meeting minutes, time sheets, and mileage reports.

The IRS discovered the overbilling scheme while investigating unrelated tax fraud by Morris, and BRIDGES went out of business. Ohio's State Auditor later reviewed BRIDGES's bank records and discovered $3,552,740 in impermissible expenditures and non-payroll payments

to employees and associates. (The audit only went as far back as 2011, so the actual loss was presumably higher.)

$265,486.75 of this money went to Angela Bowser. She had recently declared bankruptcy and had trouble obtaining a traditional bank mortgage, so Morris loaned her $117,500 to buy a house. He loaned her another $19,428.57 to buy a car. And "from time to time," Bowser approached Morris for help paying for personal expenses. For example, he gave her about $3,000 in company money when she could not afford a vacation in Mexico that she had already booked. Bowser continued to receive non-payroll checks from BRIDGES after leaving her job. Morris testified that he never wrote Bowser a personal check; all of the money he gave her came out of company accounts.

Bowser went to trial (along with co-defendants James Moody and Victoria Hawkins, fellow recipients of Morris's largesse whose appeals we address in separate opinions), and the jury convicted her on all counts:

| Count | Offense | Statute |
|-------|---------|---------|
| 1 | Conspiracy to commit program fraud and mail fraud | 18 U.S.C. § 371 |
| 5 | Program fraud | 18 U.S.C. § 666(a)(1)(A) |
| 13 | Money-laundering conspiracy | 18 U.S.C. § 1956(h) |
| 15, 19 | Money laundering | 18 U.S.C. §§ 1956(a)(1)(B)(i), 1957 |

The district court sentenced her to three years in prison, and she timely appealed.

## II. Sufficiency of the Evidence

Each of the charges had a knowledge element: The government needed to prove not just that Bowser accepted money that Morris had fraudulently obtained, but also that she knew the money was ill-gotten. *See* R. 161 at 2359, 2363–64, 2368, 2374, 2376 (so instructing the jury). She argues that the evidence of her knowledge is insufficient. We disagree.

Admittedly, the case against Bowser was far from overwhelming. For one thing, there was no *direct* evidence that she knew about the overbilling scheme. Neither Morris nor his bookkeeper implicated her in the submission of inflated reimbursement requests and forged records. She was not involved with BRIDGES's budgeting, billing, or payroll. Nor was she an authorized signer on any of the company's bank accounts. This cuts against an inference that she knew about Morris's scheme. *See United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013) ("Considering the evidence of Washington's role in generating the invoices, getting the invoices paid, and in making payments . . . it was reasonable for a jury to infer her knowledge and intent."). Moreover, unlike her co-defendants Moody and Hawkins, Bowser did not lie to the IRS investigators or the grand jury.

Bowser also made a plausible case that she believed the money that she received from Morris was legitimate. She told the IRS and the grand jury that she thought Morris was giving her personal loans for the house and car. Her boyfriend testified at trial that Morris approached him and Bowser to offer "a personal loan . . . he would allow us to borrow personal money from him to get the house." And after Morris loaned her the money for the house, Bowser had an attorney draw up a promissory note. As for the car, she "took out a title loan to repay" Morris. Bowser also has explanations for the other nonpayroll checks she received. After she left BRIDGES, she was hired as a consultant to, as Morris put it, "develop[ ] some programs for us, especially looking at

child care." Some of the checks may have been payments for this work, and others may have been for back pay or written for Bowser to cash and give the money back to Morris.

For these reasons, a reasonable juror certainly could have voted to acquit Bowser. But that is not the standard here. In sufficiency-of-the-evidence appeals, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the jury's job, not ours, "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.* "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986). And, crucially, the jury instructions stated that the knowledge element would be satisfied if Bowser "deliberately ignored a high probability" that the money she received "was procured by fraud." R. 161 at 2356; *see United States v. Williams*, 612 F.3d 500, 506–08 (6th Cir. 2010).

The circumstantial evidence is sufficient to sustain Bowser's conviction under this deliberate-ignorance standard. First, Bowser had a supervisory role at BRIDGES, and according to one colleague, she was "in charge of the everyday . . . operations" of the company. In this capacity, she wrote portions of proposals and grants and met with Lucas County officials about them. A reasonable juror could have inferred that Bowser's seniority and duties gave her enough insight into BRIDGES's finances to be aware of a high probability of fraud. (She notes testimony showing that, *on the county's end*, programming and finances were handled separately, but this does not rebut the inference from *her* role in BRIDGES.)

Second, Morris used BRIDGES checks to pay for Bowser's house and car. Yet she never questioned why Morris was using company money—more than $100,000 of it—to give her a personal loan. Moreover, Morris testified that he sometimes used BRIDGES money to cover Bowser's rent and vacation expenses. These were obviously not legitimate business expenses. A reasonable juror could have concluded that in accepting so much BRIDGES money for personal use, Bowser, in the language of the jury instructions, "deliberately closed . . . her eyes to what was obvious."

Third, the jury did not have to treat the promissory note for the home loan as exculpatory. The note was dated April 2014—about a year after Bowser bought the house. The interest rate was just 0.28 percent. As the lawyer who drafted the note explained, "[w]e use that rate where . . . the parties don't want to . . . charg[e] interest. It's the minimal applicable federal rate . . . [f]or short-term loans." The lawyer inserted that interest rate so the loan would not "be viewed as a gift" for tax purposes. Morris had no input into the terms of the note, even though he was supposedly loaning Bowser his own money. And Bowser only made one payment on the note. A reasonable juror could have inferred that the promissory note was a fig leaf, something Bowser had drawn up to "conceal [her] own wrongful acts." *United States v. Davis*, 490 F.3d 541, 550 (6th Cir. 2007).

Viewed in the light most favorable to the prosecution, the evidence of knowledge (or at least deliberate ignorance) is sufficient to sustain Bowser's conviction.

### III.  Guidelines Calculation

At sentencing, the district court held Bowser accountable for "roughly $265,000" in losses, yielding a Guidelines range of 33 to 41 months in prison. *See* U.S.S.G. § 2B1.1(b)(1). She contends that she is only accountable for a loss of $153,178.57. "We review a district court's determination

of the amount of loss attributable to a defendant for clear error." *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010). We see no clear error here.

Bowser first argues that the district court incorrectly defined "the scope of the jointly undertaken criminal activity," U.S.S.G. § 1B1.3(a)(1)(B)(i), and that she is not liable at sentencing for "the general financial misdeeds of BRIDGES or Dan Morris." But the district court agreed with her on this; she was held accountable only for the money that she personally received. The $265,000 estimate came from the State Auditor's report, which documented $265,486.75 in non-payroll checks from BRIDGES to Bowser.

Her second argument, that "the actions of [her] co-defendants were not reasonably foreseeable to her," fails for the same reason. The district court did not hold her liable for any payments to co-defendants.

Bowser provides her own loss calculation: $153,178.57, based on the cost of the house, the car, and $22,450 in non-payroll checks. The difference between this figure and the district court's is that she only counts non-payroll checks she received after leaving her job at BRIDGES. There appear to be two reasons that she excludes non-payroll checks she received while she still worked at BRIDGES. First, Morris sometimes wrote checks to employees (including Bowser) and had them cash the checks and return the money to him. But Bowser does not explain why these transactions should be deducted from her loss amount. Even if she did not pocket the proceeds, this appears to be "jointly undertaken criminal activity" involving her and Morris. U.S.S.G. § 1B1.3(a)(1)(B)(i). Second, BRIDGES sometimes struggled to meet payroll and, when that happened, Morris would later write his employees checks for back pay. The district court acknowledged this but concluded that deducting these payments would not change the Guidelines

range. Bowser does not dispute this finding, and we see no clear error in the district court's computations.

Finally, Bowser argues that the district court failed to back up its loss calculation with particularized findings. But there is no doubt about how it arrived at the $265,000 figure (the State Auditor's report) or what activity it relied on (only transactions that involved her personally). That makes this case unlike *United States v. Mehmood*, in which the district court failed to explain why it was holding the defendant liable for a co-conspirator's conduct without making any findings about the defendant's own role. 742 F. App'x 928, 945–46 (6th Cir. 2018). *See also United States v. Orlando*, 281 F.3d 586, 600—01 (6th Cir. 2002) (remanding where the district court held the defendant liable for all of the money laundered "during [his] involvement in the conspiracy," but "did not make a specific determination of when Orlando entered the conspiracy" or whether he agreed to jointly undertake all of his co-conspirators' activities). Because Bowser was only held liable for her own part in the fraud, these cases are inapposite.

IV.  Conclusion

For these reasons, we **AFFIRM** Bowser's conviction and sentence.