RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0350p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

     *v*.

KEVIN CLAY,

              *Defendant-Appellant*.

> Nos. 23-3923/24-3038

────────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:21-cr-00205-1—Jack Zouhary, District Judge.

Argued:  January 29, 2025

Decided and Filed:  December 19, 2025

Before:  GILMAN, STRANCH, and LARSEN, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:**  Amy Mason Saharia, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellant.  Rebecca C. Lutzko, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  Amy Mason Saharia, Patrick J. Looby, Alexandra Nickerson, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellant.  Rebecca C. Lutzko, Jason Manion, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

────────────────

## OPINION

────────────────

PER CURIAM.  Kevin Clay and his best friend founded Theramedical, a pharmaceutical sales company that specialized in compounded prescriptions.  But unlike other pharmaceutical companies, Theramedical marketed its compounds to prospective patients, not doctors.  The pitch:  the patient would receive a "commission"—a cut of the insurance reimbursement—

for each prescription filled. To facilitate this payment scheme, Theramedical partnered with a pharmacy that agreed to give Theramedical a portion of the insurance reimbursements. Theramedical then heavily recruited potential patients, or "sales representatives," from a local employer, whose insurance plan covered the prescriptions. And Theramedical directed the representatives to a doctor who readily doled out the prescriptions. Within just two years, Theramedical made millions of dollars. To minimize his taxable income, Clay established a public charity but treated its funds as if they were his own. Eventually, authorities caught wind of Theramedical's activities and indicted Clay, along with others. A jury convicted Clay of conspiracy to commit healthcare fraud, healthcare fraud, and making a false statement to the Internal Revenue Service (IRS). The district court sentenced him to 51 months' imprisonment and ordered him to pay nearly $7 million in restitution. Clay appeals. For the following reasons, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

I.

Clay and his close friend, Matthew Maluchnik, worked in the pharmaceutical sales industry. In 2013, they heard of a business opportunity regarding compounded pain and scar cream prescriptions. Unlike generic cream prescriptions, compounded prescriptions are custom-made in a pharmacy. The two friends learned that some pharmacies were paying patients to have their compounded prescriptions filled by the pharmacies. Sensing a lucrative opportunity, Clay and Maluchnik decided to capitalize on it.

The two men first had to find a pharmacy that would work with them. Lemma Gettachew, the owner of Central Rx Pharmacy in Cleveland, Ohio, agreed to a meeting. At the meeting, Clay and Maluchnik proposed the following business structure: the two men would establish a sales team specializing in compounded prescriptions; Central Rx would process the prescriptions and bill the insurers for them; and Central Rx would give Clay and Maluchnik 30% of the insurance reimbursement. The Central Rx owner agreed.

To test out the plan, Clay and Maluchnik each sought compounded prescriptions for themselves and some friends. Maluchnik sought a compounded prescription from Dr. Suzette

Huenefeld. She readily prescribed it. A month later, Maluchnik received a check from Central Rx worth "at least $10,000" for his prescription and those that he had encouraged a few friends to get. R. 91, Trial Tr., PageID 1223. Clay, meanwhile, went to a different doctor, and the prescriptions he and a few others obtained garnered a check from Central Rx for more than $14,000.

The two friends then set up a company called Theramedical, LLC, and started to recruit "pharmaceutical reps." *Id.* at 1229. Theramedical's pharmaceutical representatives were atypical. Rather than marketing pharmaceuticals to doctors, the representatives would receive commissions for obtaining their own prescriptions. Clay and Maluchnik endorsed this business model, encouraging representatives to get prescriptions for themselves and their family members.

Clay and Maluchnik gave their representatives Central Rx prescription pads to help ensure that the prescriptions would be processed through a pharmacy that would pay a "commission"—i.e., a cut of the insurance reimbursement—for the prescription. Bringing a prescription pad to a doctor's appointment was contrary to industry practice. Missing out on a commission, though, was costly: a single prescription could cost up to $15,000 per monthly refill, roughly $4,500 of which went to Theramedical. A percentage of Theramedical's take then went to the "sales rep," who was often the patient himself.

To ensure reimbursement, Clay and Maluchnik had to identify insurance plans that covered compounded prescriptions. The local Jeep plant's insurance covered them, and Maluchnik's aunt, Loni Peace, worked there. At Maluchnik's prodding, Peace obtained a compounded prescription, and a "commission," for herself. She then started to recruit other Jeep employees, letting them know they could make money by getting their own prescriptions. Within a few months, Peace had "recruited so many people from Jeep" to get compounded prescriptions. R. 91, Trial Tr., PageID 1237–38. Peace pocketed a cut of their commissions, pulling in nearly $500,000 from her relationship with Theramedical.

Almost all the Jeep employees obtained their compounded prescriptions through Dr. Huenefeld. And Dr. Huenefeld was not selective about writing them. One Jeep employee

testified that he brought his wife and teenage son to his appointment with Dr. Huenefeld, and all three walked out with prescriptions for compounded creams. He even obtained prescriptions for his absent seven- and eleven-year-old children. Over the course of two years, this family received over $22,000 in "commissions" for filling prescriptions that they never used.

That figure represents just a fraction of the millions of dollars that Fiat Chrysler, Jeep's parent company, spent on prescriptions prescribed by Dr. Huenefeld and processed by Central Rx.[1] Fiat Chrysler had a self-insured account with health insurer BlueCross BlueShield of Michigan. Pursuant to this structure, BlueCross would pay Fiat Chrysler employees' medical claims and bill Fiat Chrysler for them. Fiat Chrysler would then pay BlueCross the entire amount of the claim. So Fiat Chrysler footed the bill for the Central Rx prescriptions.

That bill was costly. Across a six-month period, Central Rx received $7.7 million in reimbursements for prescriptions Jeep employees had obtained from Dr. Huenefeld. A portion of these reimbursements went into Theramedical's coffers, with Theramedical receiving more than $1 million from Central Rx in the company's highest-grossing months. Some of the money trickled down to the pharmaceutical representatives. Clay and Maluchnik divided the rest equally.

To ease the tax burden on the sizable income generated through this scheme, Clay set up a foundation in late 2014. The Clay Foundation was ostensibly a nonprofit that provided scholarships for aspiring college students, and Clay designated it a public charity. The Foundation's classification as a public charity came with federal tax benefits. *See* 26 U.S.C. § 170(b)(1)(A)(vi). For example, donations to a public charity are eligible for greater deductions than those to a private foundation. But the public charity designation also came with requirements. For instance, the Foundation needed to receive a third of its money from public donations within five years of its establishment.

Clay treated the Foundation as a public charity only when it suited him. In 2014, he donated $400,000 to the Foundation, saving himself $140,000 in taxes for that year. Clay's tax

---

[1]Theramedical also worked through other pharmacies and doctors, but its business with Central Rx and Dr. Huenefeld formed the basis of the charges against Clay.

savings would have decreased by roughly $35,000 had the Foundation been private. Yet, despite the public-charity designation, Clay used the Foundation's funds for personal expenses. For instance, he spent $40,000 on silver and gold bars that he purchased in his name and stored in his bedroom. He also used the Foundation's funds to make a gift to his friend, which, according to an IRS agent, is "[a]bsolutely not" a charitable purpose. R. 83, Trial Tr., PageID 807. And Clay failed to file tax returns to report the Foundation's income. The IRS eventually revoked the Foundation's nonprofit status.

In April 2021, a grand jury indicted Clay on four counts. Count one was conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349. Count two was healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2. Counts three and four were making false statements to the IRS, in violation of 26 U.S.C. § 7206(1); count three concerned Clay's statement of his taxable income in 2014, and count four concerned his designation of The Clay Foundation as a public charity.

The government also charged Maluchnik, Peace, and Dr. Huenefeld in related cases. All three pleaded guilty to healthcare fraud, and Maluchnik also pleaded guilty to two tax charges.

Clay, meanwhile, went to trial. The jury convicted him of counts one, two, and four, but acquitted him of count three. The court sentenced Clay to concurrent terms of 51 months' imprisonment for counts one and two, and 30 months' imprisonment for count four. After additional briefing, the court also ordered Clay to pay restitution that included $6,443,815.00 to Fiat Chrysler and $403,481.46 to the IRS. Clay appeals his convictions and sentence, as well as the restitution orders.

II.

A.

Clay contests two jury instructions. First, he challenges the instruction defining "knowingly and willfully" in the healthcare fraud statute, 18 U.S.C. § 1347. Second, he challenges the instruction that omissions and concealment could support a healthcare fraud conviction in his case.

Clay stipulated at trial to the instructions he now challenges, so the invited-error doctrine is at play. *See United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993). The doctrine forecloses appellate review of a defendant-induced error unless "the interests of justice demand otherwise." *United States v. Barrow*, 118 F.3d 482, 491 (6th Cir. 1997). We have said that review may be available when the government was equally to blame for the error and the defendant claims a violation of his constitutional rights. *United States v. Montgomery*, 998 F.3d 693, 699 (6th Cir. 2021). But whether to entertain the challenge is "left largely to the discretion of the appellate court." *Barrow*, 118 F.3d at 491. And any review is limited to the search for "plain error." *Montgomery*, 998 F.3d at 698. Under that standard, Clay must show (1) an error, (2) that is plain, (3) that affects his substantial rights, and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (citation modified). "Satisfying all four prongs of the plain-error test 'is difficult.'" *Greer v. United States*, 593 U.S. 503, 508 (2021) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). In the context of jury-instruction error, this standard "requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Robinson*, 133 F. 4th 712, 721 (6th Cir. 2025) (citation omitted). For the moment, we set aside passing judgment on Clay's invitation of the instructional errors and review under the plain error standard.

i.

Clay was convicted of "knowingly and willfully" committing healthcare fraud, in violation of 18 U.S.C. § 1347.[2] The jury instructions provided that "[a]n act is done 'knowingly and willfully' if it is done voluntarily and intentionally, and not because of mistake or some other innocent reason." R. 65-1, Jury Instr., PageID 449. While this case was on appeal, we determined that a similar instruction was incorrect. *United States v. Singh*, 147 F.4th 652 (6th Cir. 2025). In *Singh*, we explained that a defendant acts "knowingly" when he has "knowledge of the facts that constitute the offense." *Id.* at 658. But "to establish a 'willful' violation of"

---

[2]Count one charged Clay with conspiracy to commit healthcare fraud. A conspiracy conviction entails a finding that "the conspirators acted with 'at least the degree of criminal intent necessary for the substantive offense' that was the object of the conspiracy." *United States v. Trevino*, 7 F.4th 414, 425 (6th Cir. 2021) (citation modified). So Clay's conviction under count one rises or falls with his conviction under count two.

§ 1347, the Government must prove that the defendant acted with knowledge that his conduct was unlawful," *id.* (citation omitted), although the defendant need not know which particular statute he violated, 18 U.S.C. § 1347(b). We assess whether an error is plain by looking to the law at the time of appeal. *Henderson v. United States*, 568 U.S. 266, 269 (2013).

Even when an error is plain, the defendant still must show that the error affected his substantial rights—that is, he must show "a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010). On top of that, he must show that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (citation omitted).

First, substantial rights. Clay was prosecuted for healthcare fraud, in violation of § 1347, and the jury was instructed on the three elements of that crime in succession. The court first instructed that, to find Clay guilty, the jury had to find that Clay "knowingly and willfully executed . . . a scheme to defraud a health care benefit program in connection with the payment for health care benefits." R. 65, Jury Instr., PageID 431. The jury was then told that this "scheme" had to "relate[] to a material fact or include[] a material representation or concealment of a material fact." *Id.* And finally, the jury was told that it had to find that the "[d]efendant had the intent to defraud." *Id.* When these instructions are read in context, *see Robinson*, 133 F.4th at 721(jury instructions must be read "as a whole" (citation omitted)), the jury was instructed that Clay's "intent to defraud" had to be linked to the "scheme to defraud a health care benefit program in connection with the payment for health care benefits."

The jury instructions defined an "intent to defraud" as an "intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about financial gain to oneself or another person." R. 65-1, Jury Instr., PageID 450. And, in context, the instructions and the proof adduced at trial made clear who the "object" of the intended deceit or cheating was—the "health care benefit program," that is, Fiat Chrysler's employee health benefits plan.

So the question becomes whether Clay has shown a reasonable probability that a properly instructed jury would have concluded that he did not know it was illegal to knowingly execute a

"scheme to defraud" Fiat Chrysler's employee health benefits plan "in connection with the payment for healthcare benefits" with the intent to "deceive or cheat" Fiat Chrysler.

Much of Clay's defense at trial consisted of the claim that he "never thought [the scheme] was wrong." R. 83, Trial Tr., PageID 898. Maluchnick testified similarly. In support, Clay testified that when he worked at Pfizer, he earned a commission and that patients sometimes received rebates for their prescriptions. Clay and Maluchnick also worked with Gettachew—a licensed pharmacist. And Clay was not directly involved in the insurance-reimbursement process.

But the government also presented evidence suggesting that Clay knew the scheme was not above-board. Maluchnik contradicted Clay's claims about how the pharmaceutical business normally worked, testifying that in his "previous experience in pharmaceutical sales, there was no reimbursement to patients for getting a prescription." R. 91, Trial Tr., Page ID 1224. So to "test" whether "these things were paying out so much and that we would actually get paid," *id.* at 1223, both Clay and Maluchnik obtained for themselves a medically unnecessary prescription for cream after a *pro forma* examination, *id.* at 1223–26. Clay and Maluchnik then used fictitious names to recruit purported "sales associates" for the scheme. They made clear to the "associates" that they could get paid for obtaining prescriptions for themselves, family, or friends, and they steered them to a particular doctor (Huenefeld) and a particular pharmacy (Central Rx). And, while Central Rx was willing to engage in the scheme, other pharmacies told Clay and Maluchnik that they would not get involved because they were "not comfortable" with representatives getting paid for their own prescriptions. *Id.* at 1256.

The panel finds it a close question whether, in light of the evidence presented, Clay has shown "a reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262. We need not resolve that issue, however, because, in the end, Clay has not shown a "grave miscarriage of justice" or that any error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (citation omitted); *United States v. Robinson*, 133 F.4th at 721–22; *cf. United States v. Murray*, 760 F. App'x 595, 598 (10th Cir. 2019) ("We conclude that, even assuming *arguendo* that [defendant] could prevail as to the first three prongs of the plain-error standard, his challenge fails as to the fourth."); *United*

*States v. Peterson*, 136 F. App'x 183, 186 (10th Cir. 2005) ("[W]e need not decide whether he has satisfied the third prong of the plain error test because, even if he has, he has not met the fourth prong."); *United States v. Fuentes-Canales*, 902 F.3d 468, 476–82 (5th Cir. 2018) (assuming without deciding that the defendant had established the first three prongs of plain error review but declining to exercise its discretion under prong four to fix the error).

Plain error's fourth prong is "an independent criterion," *United States v. Andaverde-Tinoco*, 741 F.3d 509, 523 (5th Cir. 2013), that "places an exceptionally high burden on the defendant," *United States v. Armenta-Arredondo*, 169 F. App'x 529, 532 (10th Cir. 2006). As the Supreme Court "indicated in *Olano*, this standard is not automatically satisfied [even] where a plain error affects substantial rights because otherwise the discretion afforded by Rule 52(b) would be illusory." *United States v. Rogers*, 118 F.3d 466, 473 (6th Cir. 1997) (citation omitted). Instead, "[e]rrors warranting fourth-prong correction are rare and egregious, such that they would shock the conscience of the common man, serve as a powerful indictment against our system of justice, or seriously call into question the competence or integrity of the district judge." *United States v. Mendoza-Velasquez*, 847 F.3d 209, 213 (5th Cir. 2017) (citation omitted).

Here, we return to Clay's invitation of the instructional error. We conclude that, in the circumstances of this case, it weighs against exercising our discretion under the fourth prong. As explained previously, Clay stipulated at trial to the instruction he now challenges. Generally, "it is difficult to obtain review of invited errors . . . [b]ecause doing so interferes with our adversarial system, which 'is designed around the premise that parties know what is best for them and are responsible for advancing the facts and arguments entitling them to relief.'" *United States v. Akridge*, 62 F.4th 258, 264 (6th Cir. 2023) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). That is, "[h]aving induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error." *Harvis v. Roadway Exp. Inc.*, 923 F.3d 59, 61 (6th Cir. 1991). Here, where it is a close question whether Clay has shown an effect on his substantial rights, and where

he affirmatively invited the instructional error, we are not convinced that this is the rare case of "manifest injustice" warranting the exercise of our discretion under the fourth prong.

ii.

We next consider Clay's challenge to the jury instructions on omissions and concealment. Section 1347 criminalizes obtaining the money or property of a healthcare company "by means of false or fraudulent pretenses, representations, or promises." The trial court instructed the jury that "false or fraudulent pretenses, representations, or promises" include "the knowing concealment of material facts." R. 65-1, Jury Instrs., PageID 449. The court also told the jury that it could convict Clay if he "deliberately ignored a high probability that the reimbursed claims for compounding creams were obtained by false or fraudulent . . . omissions." *Id.* at 451. Clay now says these instructions were plainly erroneous because they enabled a conviction based on a fraudulent omission, even though he had no duty to disclose.

We need not decide whether the instructions were in error or whether Clay had a duty to disclose. To prevail on plain error review, Clay must show that any error was "obvious or clear." *United States v. Barnes*, 822 F.3d 914, 924 (6th Cir. 2016) (citation omitted). And here, circuit precedent makes any error far from obvious.

In *United States v. Bertram*, the defendants had billed insurers for outdated (and thus medically unnecessary) urinalysis tests, and a jury convicted them of violating § 1347. 900 F.3d 743, 747 (6th Cir. 2018). This court upheld their convictions, explaining that the "knowing concealment of material facts" "suffices to violate [§ 1347] because omissions of material fact constitute a scheme to defraud." *Id.* at 748. In reaching this conclusion, *Bertram* rejected the defendants' argument that, because they "did not omit any requested information," the claims weren't fraudulent. *Id.* at 750. It "ma[de] no difference that the claim-reimbursement form" didn't specifically ask about the timeliness of the urinalysis tests, we reasoned, because "[i]nsurers do not expect urinalysis tests to be completed a half year to nearly a full year after they were ordered." *Id.* Nowhere in *Bertram* did we mention a duty to disclose.

One can read *Bertram* in at least two ways. From one perspective, *Bertram* affirmed fraud convictions under § 1347 based on the omission of material information, despite the

defendants having no duty to disclose.  We read *Bertram* just that way in *United States v. Montgomery*, concluding that "a defendant can be guilty of fraud through the concealment of material information in the absence of a positive legal duty to disclose that information."  2022 WL 2284387, at \*10 (6th Cir. June 23, 2022) (citing *Bertram*, 900 F.3d at 748–51)); *see also United States v. Colton*, 231 F.3d 890, 900–01 (4th Cir. 2000) (holding that although the existence of an independent disclosure duty "is relevant and an ingredient" in some fraud prosecutions, such a duty is "not an essential in all such cases," and noting that other circuits follow the same rule (citation omitted)).  From another perspective, *Bertram* reasoned that, because the insurers didn't expect to be billed for extremely delayed urinalysis tests, the defendants implicitly had a duty to disclose that information.  *See* 900 F.3d at 750 (explaining that "the industry standard for urinalysis tests was seventy-two hours, yet [the defendants] waited in some instances 100 times longer to run their tests").

Whatever the correct interpretation of *Bertram*, the fact that this court has read it as upholding fraud convictions under § 1347 based on knowing concealment of material information *absent* a duty to disclose forecloses Clay's only argument in support of a finding of plain error.  "Plain errors are limited to those . . . so rank that they should have been apparent to the trial judge without objection."  *United States v. Henning*, 286 F.3d 914, 920 (6th Cir. 2002) (citation omitted).  A lack of binding precedent demonstrating the trial court's error forecloses relief.  *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015).  Given *Bertram*'s ambiguity, along with this court's subsequent characterization of it in *Montgomery*, the district court's instructions on knowing concealment and omissions cannot be characterized as "rank" errors.  Accordingly, the district court did not plainly err.

B.

Clay next challenges testimony by Agent Marciniak, the government's case agent.  Marciniak testified as a lay witness, and her testimony spanned forty pages of trial transcript.  Clay argues that six bits of her testimony—none of which he objected to—were so blatantly inadmissible that the district court plainly erred by not excluding them *sua sponte.*  We disagree.

Clay argues that Marciniak's testimony transgressed numerous provisions of the Federal Rules of Evidence. He primarily alleges that the testimony violated Rule 701 because it lacked a foundation and wasn't helpful. *See* Fed. R. Evid. 701(a)–(b) (limiting lay-witness opinion testimony to testimony "rationally based on the witness's perception" and "helpful to clearly understanding" testimony or "determining a fact in issue"). He also asserts that most of the testimony was separately inadmissible for violating other evidentiary rules, like Rules 401 (relevance), 403 (probative value substantially outweighed by prejudice), 404 (character evidence), and 802 (hearsay).

Clay did not object to the testimony he now challenges, so we review under the plain error standard. *United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017). Because "neither party asked the district court to rule on the statements' admissibility," we do not ask whether the court was wrong to "'admit' the evidence." *United States v. Stokes*, 834 F. App'x 213, 217 (6th Cir. 2020). Instead, the question for our review is whether the testimony was so plainly inadmissible that the district court was "derelict" in failing to strike it or give a curative instruction *sua sponte*. *United States v. Ramamoorthy*, 949 F.3d 955, 960 (6th Cir. 2020); *Stokes*, 834 F. App'x at 217. Such cases are rare. *See* 1 Federal Criminal Appeals § 4:59 (July 2025). Even assuming that Marciniack's statements were "improper and inadmissible, a district court does not commit plain error merely because it fails to give curative instructions *sua sponte* any time improper evidence comes out at trial." *United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011). And the same must be said regarding a failure to spontaneously order testimony stricken from the record. The decision to strike or to issue a curative instruction might sometimes do "more harm than good by focusing the jurors on [testimony] that they otherwise might have missed or construed as innocuous." *Id.* (quoting *United States v. Deandrade*, 600 F.3d 115, 119–20 (2d Cir. 2010)). And district judges do not abuse their discretion by being mindful of the fact that defense counsel may have chosen to forego an objection out of a desire to "downplay" certain testimony. *Id.*; *see also United States v. Copeland*, 51 F.3d 611, 616 (6th Cir. 1995) (finding no reversible error in the court's failure to issue curative "instructions *sua sponte*" where doing so would have "emphasized [harmful] testimony" and "deprived the defense of its chosen trial strategy."); *Stokes*, 834 F. App'x at 217 (finding no plain error when "a curative instruction would have only highlighted" the contested statements).

We need not decide whether the district court erred here, however, because Clay has not shown an effect on his substantial rights. "[W]hen addressing plain error," we must evaluate the alleged error "against the entire record." *United States v. Young*, 470 U.S. 1, 16 (1985). Considered in context, Marciniak's statements do not undermine the trial's outcome. Nearly all of Marciniak's testimony overlapped with unchallenged testimony provided by other witnesses. *See United States v. Prather*, 138 F.4th 963, 971 (6th Cir. 2025) (finding no violation of substantial rights when the challenged testimony was cumulative of other testimony). As for the remainder, Clay has not shown a "reasonable probability" that the evidence swayed the jury's verdict. *Marcus*, 560 U.S. at 262.

First consider Marciniak's statements discussing how Maluchnik and Clay created a lot of companies or "schemes" to "accumulate wealth."[3] On this topic, witnesses other than Marciniak presented the following unchallenged testimony: Clay and Maluchnik each had "an entrepreneurial spirit," and the two talked about creating a business together "[f]rom the get-go." R. 83, Trial Tr., PageID 877, 879. The two friends had "a couple different things going on," including a catering company, music production company, and real estate venture. R. 91, Trial Tr., PageID 1242. In fact, they owned six entities in 2014 and four in 2015. And Clay considered starting another "lucrative business" after the compounded prescriptions "business" dried up because, in his words, "you don't really get in the business unless you want to make money." R. 83, Trial Tr., PageID 903.

These statements conveyed to the jury that Clay wished to run a profitable business and that he pursued a variety of avenues to do so. Agent Marciniak's similar statements on the matter provided no substantively unique information. Her editorializing might have been unnecessary. Clay objects, for example, to her describing Clay and Maluchnik as "big wannabe successful business owners" and referring to their ventures as "schemes." Appellant Br. at 46. But we see no reasonable probability that these minor comments affected the jury's verdict. The

---

[3]The particular statements were as follows: (1) "I learned through the investigation that Matt and Kevin were best friends. They didn't do anything separate and apart from each other. They were big wannabe successful business owners. They created many different businesses, LLCs, to try and accumulate wealth," R. 91, Trial Tr., PageID 1307; and (2) "Ultimately, once they realized that this compound cream scheme was being shut down through the insurance company, always being a day late and dollar short, as I say, falling behind, they moved on to the next scheme," *id.* at 1308.

jury heard far more damaging testimony about Clay's business endeavors. For example, Maluchnik, Clay's business partner, testified that he had pleaded guilty to healthcare fraud stemming from Theramedical's business. Such incriminating testimony dwarfed any prejudicial effect of Marciniak's arguably disparaging descriptions.

For similar reasons, we are unpersuaded that Clay has shown prejudice from Marciniak's unflattering characterization of Clay's various business endeavors. She described Clay and Maluchnik as "always being a day late and dollar short," so that when the insurance company shut down their "compound cream scheme" they were on to the next scheme. R. 91, Trial Tr., Page ID 1308. And she explained that the "wellness" supplement Clay and Maluchnik sold was "a resveratrol pill." *Id.* at 1308–09. She then described the two men's "joke" that "it's a lot of red wine. But they were told that that wouldn't pay out because insurance companies were [not] paying that for proactive wellness." *Id.* Yet Clay himself offered testimony in a similar vein: When the compounded prescriptions business "started to fall off," he and Maluchnik "immediately . . . start[ed] looking for other opportunities," including urine testing. R. 83, Trial Tr., PageID 902. But after getting it off the ground, they learned "it wasn't as lucrative" because "the company who was doing the billing for us couldn't collect payment." *Id.* at 903. Marciniak's comment that the two friends joked about the resveratrol pill being merely red wine might have painted Clay in an unfavorable light. But there's no reasonable probability that it swayed the jury's verdict—again, the government introduced much more incriminating evidence.

Clay next argues that he was harmed by Marciniak's statements that Maluchnik and Clay were "always together," and may even have been "lovers."[4] These statements, he says, "undermine[d] Clay's defense that Maluchnik, not Clay, handled the day-to-day operations." Appellant Br. at 46. But many witnesses, other than Marciniak, testified to how close the two men were. Maluchnik and Clay had been best friends since 2002 and were in each other's weddings. Clay used to attend Maluchnik's family dinner on Sundays. The two friends lived "50 to a hundred feet" apart and saw each other daily; indeed, law enforcement officials found

---

[4]The particular statement was: "[Maluchnik and Clay] went to the gym together. They went to breakfast together. They went to lunch together. They went to dinner and drinks together. They went to the bank together. . . . We were told—we know that they were always together. There was, like, accusations that they actually were lovers at one point." R. 91, Trial Tr., PageID 1311 (objection and stricken testimony omitted).

Clay's tax documents in Maluchnik's apartment. R. 91, Trial Tr., PageID 1217. What's more, Clay and Maluchnik "[s]eemed like they had no secrets from each other" and were "living parallel lives in some respects." R. 82, Trial Tr., PageID 764. This uncontested testimony conveyed to the jury how intertwined Clay's and Maluchnik's lives were. To be sure, no one else testified that Clay and Maluchnik were rumored to be lovers. And Clay is right that Marciniak's speculations about his sexual relationships "ha[d] no place in [his] criminal trial." Appellant Br. at 47. Yet Marciniak's stray comment of that nature was not so prejudicial as to merit reversal. Clay argues that the government tried to emphasize the closeness of the two men's relationship in order to undermine his defense that Maluchnik, not he, closely oversaw Theramedical's operations. But a wealth of evidence painted the two men as inseparable; and whether they were best friends or romantic partners would have little bearing on this defense. Because other testimony conveyed just how close the two friends were, Marciniak's testimony on the matter did not affect Clay's substantial rights. *See Prather*, 138 F.4th at 971.

Lastly, Marciniak's commentary about Dr. Huenefeld's drinking habits and patient base was cumulative of other testimony.[5] Maluchnik, for instance, testified that Dr. Huenefeld's office was a "small primary care practice" that had "little dogs running around" and was not "the cleanest place," likely "due to the drinking." R. 91, Trial Tr., PageID 1225, 1242. He also shared that Dr. Huenefeld once showed up to a dinner "already a little bit drunk" and "got so drunk" that the wait staff almost kicked her out. *Id.* at 1225. And in unchallenged testimony, Marciniak testified about a trial exhibit showing that Dr. Huenefeld "didn't have a very large patient base" prior to 2014. *Id.* at 1307. Marciniak's contested commentary about Dr. Huenefeld was not the sole avenue by which the jury learned of Huenefeld's drinking habits and small client base. So we are not persuaded that it affected the jury's verdict.[6] In sum, Clay has

---

[5]The particular statement was: "[Dr. Huenefeld's] patient base was lacking, if you will. She didn't really have a large practice. She was floundering, as you've heard. She had a drinking problem. She just wasn't a very well-respected doctor. She didn't have a lot of income as a physician." R. 91, Trial Tr., PageID 1302.

[6]Clay does not explain how he was prejudiced by Marcianek's statement that her interviews with numerous Jeep employees "corroborate[d]" what the records revealed. R. 91, Trial Tr., PageID 1312. Regardless, we see no prejudice. The records Marciniak referenced revealed a roughly 800% increase in visits by Jeep employees to Dr. Huenefeld in 2014. That data itself is far more incriminating than Marciniak's statement that her interviews with Jeep employees corroborated it.

not shown that he was prejudiced by the district court's failure to strike these segments of Marciniak's testimony *sua sponte*.

## C.

Clay next contests the restitution orders to Fiat Chrysler and the IRS. We give de novo review to the scope of a restitution order, and we review the amount of restitution ordered under the abuse of discretion standard. *United States v. Sawyer*, 825 F.3d 287, 291–92 (6th Cir. 2016).

### i.

We begin with Fiat Chrysler's restitution award. The PSR calculated a loss of $7,159,795 to Fiat Chrysler. Clay argued below that this figure should have excluded medically necessary prescriptions. At sentencing, the district court agreed, explaining there's no "question that there can be a legitimate use of creams . . . for patients with legitimate pain." R. 115, Sent'g Hr'g Tr., PageID 1651. Because the court found that some of the prescriptions were medically necessary, it compared the number of prescriptions before and after the fraud and arrived at a loss greater than $1.5 million but less than $3.5 million. When ordering restitution, however, the court refused to exclude any medically necessary prescriptions, reasoning that payments "procured by kickbacks, whether they are medically necessary or not[,] are subject to restitution." R. 111, Restitution Order, PageID 1604 (citation omitted). And because Maluchnik's plea agreement stipulated that he would pay 10% of the restitution amount, the court ordered Clay to pay the remaining 90%—$6,443,815—pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A.

Clay challenges this order on two grounds. First, he continues to contest the inclusion of medically necessary prescriptions in the restitution award. Second, he argues that the court's apportionment of restitution violated 18 U.S.C. § 3664(h). We address these challenges in turn.

*Legitimacy of the Claims*. Clay challenges the scope of the restitution order, saying that it cannot encompass legitimate medical claims. We review such challenges de novo. *See United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019); *United States v. Bane*, 720 F.3d 818, 827–28 (11th Cir. 2013); *see also United States v. Jones*, 641 F.3d 706, 713 (6th Cir. 2011) (reviewing

de novo whether the restitution order could compensate losses stemming from acquitted conduct); *United States v. Gray*, 121 F.4th 578, 586 (6th Cir. 2024) (reviewing de novo whether the restitution order impermissibly included losses resulting from conduct not covered by the indictment).

The district court erred when it included medically necessary prescriptions in the restitution award. Both the MVRA and our restitution caselaw illustrate this. Consider first the plain text of the MVRA. It provides that, if the defendant's "offense result[ed] in damage to or loss or destruction of property of a victim of the offense," and "return of the property . . . is impossible, impracticable, or inadequate," the "order of restitution shall require that [the] defendant . . . pay an amount equal to . . . the value of the property . . . less . . . the value . . . of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). Plainly, the MVRA is concerned with restoring the victim to the *status quo ante*. *Cf. Hughey v. United States*, 495 U.S. 411, 416 (1990) ("[T]he ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event . . . ."). And regardless of fraudulent conduct, Fiat Chrysler's insurance would have covered medically necessary claims. So payment for such claims wasn't a loss caused by Clay's conduct.

Section 3664, which governs the "[p]rocedure for issuance" of restitution, confirms that restitution is concerned with the victim's losses. It instructs that "the court shall order restitution to each victim in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and it references the victim's "loss" throughout, *see, e.g.*, *id.* § 3664(e), (f)(1)(A), (h), (i). The MVRA thus limits victim compensation to the *loss* suffered, which would not include medically necessary prescriptions.

Our caselaw corroborates this. We have repeatedly recognized that courts can grant restitution only for the actual loss the victim(s) suffered. *See United States v. Fike*, 140 F.4th 351, 357 (6th Cir. 2025) ("Restitution awards must reflect the victim's 'actual loss' . . . ." (citation omitted)); *United States v. White*, 492 F.3d 380, 418 (6th Cir. 2007) (stating that "a restitution award may not exceed the 'loss caused by the conduct underlying the offense'" (quoting *Hughey*, 495 U.S. at 420)); *United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009) (noting that "the restitution award [must] be based on the amount of loss *actually caused* by the

defendant's offense" (citation omitted)).  To do otherwise would "provide a windfall for crime victims," *Bane*, 720 F.3d at 827 (citation omitted), in contravention of restitution's purpose, *see Boring*, 557 F.3d at 714.

Our cases calculating loss for sentencing purposes bolster the conclusion that medically necessary claims are not a "loss" and thus cannot be included in a restitution order.  In *United States v. Mehmood*, another healthcare fraud case, we vacated the district court's loss calculation after the court reasoned that no claims were legitimate because Medicaid wouldn't have paid them had it known of the fraudulent scheme.  742 F. App'x 928, 940–41 (6th Cir. 2018).  We explained that, under the Guidelines, the "aggregate dollar amount of *fraudulent* bills submitted to the Government health care program" was prima facie evidence of the intended loss amount. *Id.* at 941 (citation modified).  So "the value of any *legitimate* claims, if established, must be offset against the aggregate billings."  *Id.*; *see also United States v. Montgomery*, 2022 WL 2284387, at *13) (6th Cir. June 23, 2022) (recognizing that "legitimate claims should be offset 'if established'" (citation omitted)); *United States v. Bryant*, 849 F. App'x 565, 571–72 (6th Cir. 2021) (affirming the district court's calculation of loss that "did not include legitimately billed claims").  To be sure, *Mehmood* concerned sentencing, whereas this case concerns restitution. But when it comes to actual losses, restitution figures and Guidelines-loss determinations are usually the same.[7]  *United States v. Dadyan*, 76 F.4th 955, 959 (9th Cir. 2023); *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017).  And we see no reason why legitimate medical claims, which don't constitute actual losses under the Guidelines, would nevertheless be losses for restitution purposes.  *Compare* U.S.S.G. § 2B1.1(b)(1)(C)(i) (defining "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense"), *with United States v. Carrasquillo-Vilches*, 33 F.4th 36, 45 (1st Cir. 2022) (defining "[a]ctual loss" under the MVRA as the "pecuniary harm that would not have occurred but for the defendant's criminal activity" (citation omitted)).

---

[7]Of course, differences in the language of the MVRA and Guidelines might result in different actual loss calculations.  *See United States v. Agrawal*, 97 F.4th 421, 442 (6th Cir. 2024) (observing that "a court's calculation of 'loss' under [the MVRA] need not match its calculation of 'loss' under the guideline").  And, in some instances, the restitution figure may surpass the actual loss under the Guidelines.  *See United States v. Dadyan*, 76 F.4th 955, 959–60 (9th Cir. 2023).  But the government doesn't point to any language in the MVRA that would warrant such an outcome here.

For these reasons, the district court should have separated legitimate from illegitimate medical claims in calculating restitution. Its failure to do so warrants vacatur of the restitution order to Fiat Chrysler.

*Apportionment*. Clay also challenges the district court's apportionment of the Fiat Chrysler restitution order. Clay argues that the order, which makes him solely liable for 90% of the restitution to Fiat Chrysler, violates § 3664(h). Reviewing this claim de novo, *see United States v. Blanchard*, 9 F.3d 22, 24 (6th Cir. 1993), we agree.

Section 3664(h) states that if more than one defendant has caused a victim's loss, the court "may make *each defendant* liable for payment of the *full amount* of restitution or may *apportion liability* among the defendants *to reflect the level of contribution* to the victim's loss *and economic circumstances* of each defendant." § 3664(h) (emphasis added). In other words, the court can either (1) apply joint and several liability or (2) apportion liability among the defendants based on their culpability and economic circumstances. *United States v. Bailey*, 973 F.3d 548, 576 (6th Cir. 2020); *United States v. Bogart*, 576 F.3d 565, 575 (6th Cir. 2009). The district court chose apportionment. So § 3664(h) required the court to calculate Clay's liability based on his economic circumstances and contributions to Fiat Chrysler's losses in comparison to those of Maluchnik, Peace, and Huenefeld.

Despite this statutory obligation, the sole reason the district court gave for its apportionment determination was that Maluchnik agreed to pay 10% of the restitution pursuant to a plea agreement. The court didn't consider Clay's, Maluchnik's, Peace's, or Huenefeld's contribution to Fiat Chrysler's losses. Nor did it consider the other defendants' economic circumstances. Though courts are "not required to use any particular formula for apportionment," *United States v. Salas-Fernandez*, 620 F.3d 45, 49 (1st Cir. 2010), they also cannot ignore the statutory parameters of § 3664(h). Because the district court did, it erred.

The government resists this determination. It says that § 3664(f)(1)(A) requires the court to order restitution to Fiat Chrysler "in the full amount" of its losses. Because Maluchnik's plea deal provided that he would pay 10% of restitution, the other 90% had to come from someone. And that someone was Clay.

In support, the government cites *United States v. Williams*, 612 F.3d 500 (6th Cir. 2010). There, the defendant challenged the restitution award because it was greater than the total loss the government had identified at his codefendant's prior sentencing. *Id.* at 510. He insisted that estoppel prevented the government from seeking a greater restitution amount from him. *Id.* We disagreed. *Id.* "[F]aced with choosing between a statutory obligation"—that the defendant fully compensate the victims for their losses—and the equitable doctrine of estoppel, we concluded that the "mandatory language of the MVRA trump[ed] the equitable policies underlying" estoppel. *Id.* at 513.

*Williams* doesn't help the government. Clay's argument derives from the statute's language, not an equitable doctrine. And, if anything, *Williams* undermines the government's position. We observed there that "the MVRA applies regardless of any plea agreement" and, unlike 18 U.S.C. § 3663, it "does *not*" permit the court to "order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." *Id.* at 511–12 (citation omitted). Because the court below allowed Maluchnik's plea agreement to override § 3664(h)'s imperatives, it erred even under *Williams*' logic.

The government also posits that any error was harmless—beneficial, in fact—since the court could have held Clay responsible for the full restitution amount. But we are not persuaded that Clay suffered no harm. Even if the court had ordered Clay liable for the full amount, Clay would have had a contribution claim against his codefendants for any amount that surpassed his personal responsibility. *See United States v. Yalincak*, 30 F.4th 115, 123 (2d Cir. 2022); *United States v. Borino*, 123 F.4th 233, 244 & n.4 (5th Cir. 2024). And the trial record indicates the amount could be substantial: though Clay co-founded and co-owned Theramedical, Maluchnik, Peace, and Huenefeld were highly active in recruiting "pharmaceutical reps" and enabling fraudulent prescriptions.

The government further argues that, if we remand, the court will have no choice but to impose a "hybrid" restitution order, which would make Clay fully liable anyway. But hybrid orders are typically appropriate when "one defendant organizes a criminal scheme and enlists numerous others to play limited roles." *Yalincak*, 30 F.4th at 123. Under such orders, the most culpable among the defendants is liable for the full amount of the loss, while the less culpable are

liable for only the losses they caused. *Id.* at 125. Though perhaps a hybrid restitution order holding *both* Clay and Maluchnik fully liable would have comported with this structure, it's hard to see how a hybrid restitution order holding *only* Clay fully liable would be appropriate. A hybrid restitution order still must abide by § 3664(h)'s command that liability be apportioned among defendants according to their contributions to the victims' losses. *Id.* at 124–26. Requiring Clay to pay 100% of restitution under a hybrid restitution order, while Maluchnik pays 10% and Peace and Huenefeld pay nothing, would not abide by this requirement. We thus disagree that any error was harmless.

ii.

Clay also contests the $403,481.46 restitution order to the IRS on two grounds.[8]

*Unsubstantiated.* To start, Clay argues that the entire restitution award to the IRS is unsubstantiated. We review under the abuse of discretion standard. *See Sawyer*, 825 F.3d at 294.

Below, Clay objected to the PSR's calculation of restitution to the IRS, arguing that trial testimony supported a loss of only $35,000. The government thus had to prove the loss by a preponderance of the evidence, *Fike*, 140 F.4th at 357, using evidence that had a "sufficient indicia of reliability to support its probable accuracy," *Sawyer*, 825 F.3d at 295 (citation omitted).

The government failed to carry its burden. The PSR stated that the restitution award was based on calculations provided by the IRS. In defending the award, the government simply stated that it "believes the PSR calculations for IRS restitution are correct." R. 105, Gov. Restitution Br., PageID 1573. But neither the PSR nor the government explained how the IRS arrived at its results. In essence, the restitution award derived from the IRS's say-so. Relying on a victim's bare assertion of its loss is insufficient to support a restitution award. *See United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) ("[T]he district court erred by relying

---

[8]The court ordered restitution to the IRS as a condition of supervised release under 18 U.S.C. §§ 3563(b)(2), 3583(d). The court's restitution order nevertheless must "conform to the provisions of the [Victim and Witness Protection Act (VWPA), *see* 18 U.S.C. § 3663]." *United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002).

exclusively on the one-page loss summaries provided by the victims and in not requiring more detailed explanations of the losses each victim suffered."); *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998) ("[T]he government must provide the district court with more than just the general invoices submitted by [the victims], ostensibly identifying the amount of their losses."). The court thus abused its discretion in awarding $403,481.46 in restitution to the IRS.

The government's arguments to the contrary are unpersuasive. It first contends that Clay didn't dispute the accuracy of the restitution award when his PSR was being prepared. True, Clay did not dispute the restitution calculation in his objections to the PSR. But he objected in his sentencing memorandum, which he filed during the PSR's preparation. And the district court itself removed the restitution issue from the sentencing hearing, stating that "[r]estitution is a discussion that we're going to finalize and give counsel a chance to discuss . . . among themselves." R. 115, Sent'g Hr'g Tr., PageID 1683. "I'll let you talk first with each other," the court added. *Id.* at 1687. Clay then raised his objection once again in his restitution brief. Clay thus put the restitution amount in dispute. *See Williams*, 612 F.3d at 516–17; *cf. United States v. Pupo*, 995 F.3d 23, 27, 29 n.5 (1st Cir. 2021); *United States v. Hammond*, 742 F.3d 880, 884 (9th Cir. 2014).

Pointing to *United States v. Small*, 988 F.3d 241 (6th Cir. 2021), the government also faults Clay for not providing evidence to contradict the IRS's calculation of its loss. In *Small*, the court explained that "[i]n assessing whether an issue is in dispute at sentencing, we generally require a defendant to produce some evidence that calls the reliability or correctness of the alleged facts into question." *Id.* at 257 (citation modified). The defendant's bare denial will not suffice. *Id.* Here, however, Clay offered more than a bare denial. In his sentencing memorandum, Clay argued that "[i]f not zero, the loss should be no more than $35,000." R. 90, PageID 1120. And he pointed to the testimony of the government's IRS witness in support of his assertion. *Id.*

In sum, Clay disputed the loss calculation, and the only justification ever provided for it was the IRS's word. A victim's unadorned assertion of its loss does not satisfy the preponderance-of-the-evidence standard. Thus, the district court abused its discretion in its restitution order to the IRS.

*Acquitted Conduct.*   Clay also argues that the district court erred by basing a large portion of the restitution order—$266,466—on conduct for which he was acquitted.  We consider this challenge to aid the proper resolution of this case on remand.

We review the legality of the district court's restitution order de novo.  *See Jones*, 641 F.3d at 713.  For an offense that has "a scheme, conspiracy, or pattern of criminal activity" as "an element," the court "may order . . . restitution to any victim of such offense."  18 U.S.C. § 3663(a)(1)–(2).  A "victim" is "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  *Id*. § 3663(a)(2).  A district court may order restitution to a victim harmed by the defendant's acquitted conduct if such conduct was part of the "scheme, conspiracy, or pattern of criminal activity" for which the defendant was convicted.[9]  *See Jones*, 641 F.3d at 714 (citation omitted).  When, as here, the defendant goes to trial, the indictment defines the scope of the "scheme, conspiracy, or pattern" of criminal activity.  *Id.*

Clay's indictment reveals that his acquitted conduct was not part of the conspiracy or scheme for which he was convicted.  Count one charged Clay with conspiracy to commit *healthcare fraud* "by causing *healthcare insurance companies* to issue reimbursements for expensive medically unnecessary compounded medications, collecting a percentage of those reimbursements[,] and failing to disclose to the insurance companies that 'patients' were being paid for their own prescriptions."  R. 1, Indictment, PageID 3 (emphasis added).  And count two charged him with "execut[ing] and attempt[ing] to execute the above-described scheme and artifice to defraud a *health care benefit program*."  *Id.* at 8 (emphasis added).  Put simply, the scheme was healthcare fraud; and the victims were healthcare companies and healthcare benefit programs.

The jury acquitted Clay of count three.  That count accused Clay of making a false statement on a tax return.  It didn't mention healthcare fraud, healthcare companies, or healthcare

---

[9]For example, say a defendant faced several counts of healthcare fraud, but the jury convicted him of only one count.  The court may use the conduct underlying the acquitted charges to calculate restitution for a victim, so long as the victim was harmed by the same scheme underlying the defendant's healthcare fraud conviction and the government proves the loss by a preponderance of the evidence.  *See Jones*, 641 F.3d at 713–15; *Fike*, 140 F.4th at 357.

benefit programs, and it didn't reference counts one or two. So the indictment doesn't support the conclusion that Clay's acquitted conduct, which caused the IRS's purported loss, was part of the conspiracy or scheme for which Clay was convicted. The court thus erred in ordering restitution to the IRS based on count three.

The government disputes this, arguing that Clay understated his income to the IRS with the goal of "unlawfully enrich[ing]" himself, and that this goal was common to counts one and two. *Id.* at 3. But restitution to victims that stems from conduct for which the defendant was not convicted is permissible only "when the loss is attributable to the *precise scheme* that was an element of the defendant's convicted offense." *Jones*, 641 F.3d at 714 (emphasis added). The indictment did not indicate that the conspiracy and scheme underlying Clay's two healthcare-fraud-related charges encompassed lies about his taxable income. *Cf. United States v. Kones*, 77 F.3d 66, 71 (3d Cir. 1996) ("'[V]ictim' within the meaning of § 3663(a)(1) and (a)(2) does not include a person who has experienced no harm arising from the criminal conduct that gives rise to the offense of conviction."). Put simply, the IRS was not a victim of Clay's healthcare fraud conspiracy or scheme, so Clay's acquitted conduct with respect to the IRS could not be a basis for restitution.

D.

Finally, Clay challenges the district court's application of a four-level sentencing enhancement for his leadership role in the fraudulent scheme. Section 3B1.1 of the Sentencing Guidelines imposes a four-level leadership enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). To qualify as a leader or organizer, the defendant must have "exert[ed] control over at least one participant in a supervisory, managerial, leadership, or organizational capacity." *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997). A "participant" is one "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1.

Generally, "[w]e review the district court's legal conclusion that a person is an organizer or leader under § 3B1.1 deferentially, and its factual findings for clear error." *United States v.*

*House*, 872 F.3d 748, 751 (6th Cir. 2017) (citation modified). Clay, however, argues that deferential review doesn't apply because the district court made no factual findings to justify the enhancement. And according to Clay, when a district court doesn't provide a factual basis for applying a sentencing enhancement, we conduct de novo review to determine whether the enhancement is applicable or whether we must remand for further fact finding. *See United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir. 2000). The government, however, insists that our review should be deferential because, although Clay challenged the issue in his sentencing memorandum, he failed to reassert the challenge during sentencing and the district court appropriately adopted the PSR when applying the leadership enhancement. We find the record in this case sufficiently unclear, as to both issue preservation and the factual basis for the enhancement, that a remand is warranted.

Clay initially contested the leadership enhancement in his sentencing memorandum. But at the sentencing hearing, the district court adopted the PSR (which recommended applying the enhancement) and stated that it had "discussed with counsel several of those objections [in Clay's sentencing memorandum] that would affect the guidelines range. And after consulting with the group, I have decided to amend the guidelines range." R. 115, Sent'g Hr'g Tr., PageID 1647. Nonetheless, the court later asked the government to explain why the court should apply the leadership enhancement. The government offered an explanation, but the court never commented on the government's arguments or otherwise explained why it applied the enhancement. It's not clear then whether the district court was relying on the government's argument or the PSR to support the enhancement. Given this confusion and the fact that a remand is already necessary for the court to reconsider the restitution award, we remand for the district court to reconsider or explain the factual basis for the leadership enhancement.

Clay asks us to go a step further—he requests that we vacate the enhancement on the ground that the record fails to support it. *See United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000). We decline to decide whether the record does or does not support the leadership enhancement. Instead, we leave the question for the district court on remand, which is in a better position to decide in the first instance. *See Buford v. United States*, 532 U.S. 59, 64 (2001).

\* \* \*

For the foregoing reasons, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.